**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Daniels, | No. CV-23-02359-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Department of Veterans Services, et al., | |
| Defendants. | |

Before the Court are Defendant's[1] Motion for Summary Judgment, (Doc. 43), and Plaintiff's Motion for Partial Summary Judgment. (Doc. 41). For the reasons below, Plaintiff's Motion will be denied, and Defendant's Motion will be granted in part and denied in part.

## I.    Background[2]

Plaintiff began working for the Arizona Department of Veterans Services ("ADVS") in January 2013 and was promoted to Facilities Project Manager in September 2013. (Doc. 42-2 at 2). About two years later, Luis Marquez was designated the Assistant Deputy Director of ADVS and became Plaintiff's direct supervisor. (Doc 42 ¶ 4). Though the exact timing and content are disputed, Marquez engaged in abusive behavior toward Plaintiff and other employees. (Docs. 42 ¶ 6-10; 44 at 29-32). Plaintiff alleges Marquez'

---

[1] Plaintiff originally brought these claims against Arizona Department of Veterans' Services and the State of Arizona. AZDVS has since been dismissed from the action; thus, the State of Arizona is the only remaining defendant.
[2] Unless otherwise noted, all facts set forth below are undisputed or not subject to reasonable dispute based on proffered admissible evidence.

conduct included sexually and racially harassing comments to and about Plaintiff, including repeatedly telling Plaintiff he had a "tight ass," stating that Plaintiff's work with other employees must be going well because they "like big black dick," and commenting in front of others that Plaintiff and another employee had been "getting it on." (Docs. 42-1 at 2; 42-2 at 12). Marquez allegedly also once referred to a Jonas Brothers' song while talking to Plaintiff, stating that it sounded like the lyrics said, "I want you to suck me." Marquez also threatened, swore, and yelled at Plaintiff and other employees. Plaintiff alleges these instances continued at least through 2021 and worsened when Plaintiff "pushed back" against Marquez' mistreatment. (Doc. 42-1 at 3).

Plaintiff's performance evaluations from 2019 state that he "meets expectations" in the areas of customer service and teamwork and cooperation, and that he "could show more patience and respect towards others," and that he "needs to understand" leadership needs and others' differences in priorities. (Doc. 42-2 at 8). In November 2021, HR officials began an inquiry[3] into complaints they had received regarding Plaintiff's behavior and recorded other employees' statements describing Plaintiff as "unprofessional and brusque," "abrupt, aggressive and domineering" and "insubordinate and disrespectful," and stating that he "regularly bad-mouthed other employees, and especially talked poorly about Executive Leadership; claiming that they didn't know what they were doing." (Doc. 51-4 at 4).

Plaintiff's evaluation from 2021, conducted by Luis Marquez and delivered to Plaintiff in January 2022, stated that Plaintiff "does not treat [other staff he is assisting] with courtesy and respect," is "easily upset, does not listen, and jumps to conclusions," and his "behavior toward [other staff] is unacceptable and he needs to completely change his attitude," which "causes conflicts that prevent an effective collaboration." (Doc. 42-2 at 9). Plaintiff alleges Marquez refused to give Plaintiff a bonus or raise in March 2022, but Defendant states Plaintiff was not offered a raise due to his behavioral issues noted in the

---

[3] The results of this inquiry were provided to Mr. Marquez to be addressed in Plaintiff's next performance evaluation, but Marquez was not involved in the investigation. (Doc. 42-2 at 22).

performance evaluation, and he refused the offered merit incentive because he objected to the amount. (Doc. 51-4 at 4).

Plaintiff filed an internal complaint with HR about Marquez in May 2022. (Doc. 42-2 at 12). On review, Defendant's Office of Equal Opportunity concluded that the specific sexual comments Plaintiff referenced occurred in 2020, allegedly beyond the statute of limitations for reporting discrimination based on sex, and declined to investigate them further, (Doc. 44 at 29), but did investigate "unprofessional behavior, including yelling and the use of profanities." (*Id.*) Several other employees were interviewed and stated they had been subjected to Marquez' bad behavior and received no support from HR or ADVS Director Colonel Wanda Wright. Ms. Elena Adame said that she had been yelled and sworn at by Marquez in the presence of Director Colonel Wanda Wright and CFO Amy Besco, and that Besco laughed and Wright said nothing; Ms. Leanna DeKing said there appeared to be "a group of individuals known as the mean girls, and it included an HR person"; Ms. Nicole Sullivan alleged Wright and Assistant Director John Scott "were both aware of Mr. Marquez' behavior but chose not to get involved,"; Ms. Wendy Bevilacqua recalled witnessing Marquez make "derogatory—almost condescending—statements to people"; Mr. Bryan Durham described "an uncomfortable exit interview with the Director" in which he felt she was "condescending and rude"; Ms. Tera Shere recounted Marquez' promotion to Assistant Deputy Director despite previous complaints, and that when she spoke to Wright about concerns regarding Marquez' behavior, Wright "told her, in essence, that she was weak" and "told her she was the problem because she was unable to accept other people's behaviors"; Marquez himself stated profanity "is part of the culture"; and Chief Human Resources Officer Danielle Salomon recalled complaints regarding Marquez and his team and that she had personally found that Marquez, Daniels, Besco, and Accounting Manager Elizabeth Rominger "can come across very strong." (Doc. 42-2 at 17-22).

The allegations of unprofessional behavior by Marquez were substantiated, and ultimately, he was given the option to either resign or be terminated. He resigned effective July 11, 2022.

Shortly after Plaintiff filed his complaint with HR in May 2022 regarding Marquez, a white employee, Derek Large, began recording phone calls with Plaintiff. Large recorded calls on May 18, 2022, June 3, 2022, and June 9, 2022. (Doc 42-2 at 6). One of the calls recorded Plaintiff saying, in regards to Director Wanda Wright and Deputy Director John Scott,

> "…and its all lack of leadership, because she was not qualified for that job, and they, and it was like a fucking affirmative action bullshit. They wanted, you know, oh they got pressure from some of the black vets to hire her, and I like, 'fine, you want to hire a black person, make sure they're fucking qualified!' I said 'that's why people don't like affirmative action, because you just grab the first minority you see on the street corner with a whiskey bottle in their hand and you give them a fucking job . . . . You know, and then John Scott, same way. He has no, uh, business in his position. He doesn't know what he's doing either."

(Doc. 44 at 50). Large gave these recordings to his supervisor Kim Trotta on June 13, 2022, the month after Plaintiff had filed his complaint against Marquez and while the investigation into Marquez was still underway. Based on the recordings, Defendant began another inquiry into Plaintiff's behavior. (Doc. 44 ¶18-19). At the conclusion of the investigation, Plaintiff was given the option to resign or be terminated. When he refused to resign, Plaintiff was terminated effective July 11, 2022, the same day as Marquez.

Plaintiff's termination paperwork stated: "employee has engaged in insubordinate behavior and made unprofessional, profane, racially charged, and derogatory statements to a co-worker while on duty" and,

> "Mr. Daniel's supervisory chain has been working with him since 2019 to address concerns related to impatience, disrespect, and lack of courtesy that has led to confrontational interactions with customers and coworkers. Executive leadership does not believe further corrective action will be effective in light of Mr. Daniels' failure to respond to the coaching and correction he has previously received, coupled with his articulated disdain and lack of respect for his chain of command that would administer corrective action."

(Doc 44 at 67). Mr. Large then was offered and he accepted Plaintiff's position.

Plaintiff alleges Mr. Large acted at Defendant's behest in an attempt to find a pretext

to terminate Plaintiff. Defendant and Mr. Large claim Large acted alone and of his own volition "for the purpose of providing proof to ADVS of Danels' inappropriate behavior and comments toward coworkers" and out of "concern[] that Daniels would say one thing in private conversations with [Large] and then another contradictory thing in the workplace to put [Large] in a negative light." (Doc. 53 ¶ 18).

Plaintiff filed a Charge of Discrimination with the EEOC in January 2023, alleging discrimination on the basis of race and sex and retaliation. In the Charge, Plaintiff (1) described two of Marquez' alleged comments from 2021, (2) alleged Marquez had refused to give him a bonus or raise in March 2022, (3) described his complaint, Marquez' resignation, and Plaintiff's termination, and (4) stated he believed his termination was in retaliation for filing the complaint with HR.

Plaintiff then brought this action for discrimination on the basis of sex, race, and age, and for retaliation. Defendant has moved for summary judgment on all claims. Plaintiff has moved for summary judgment on the issue of liability for all claims.

## II.    Legal Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. Id.

At summary judgment, the Court considers only admissible evidence. See Fed. R. Civ. P. 56(c)(1)(B). When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the

[admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

### III.    Discussion

#### a.  Administrative Exhaustion

Noting that "[e]xhausting administrative remedies by filing a timely charge with the EEOC or the appropriate state agency is a statutory pre-requisite for an employee to pursue litigation under Title VII," (Doc. 43 at 2), Defendant argues Plaintiff's claims for sex, race, and age discrimination were not timely exhausted administratively. The Court addresses each claim in turn.

Plaintiff brings claims for discrimination on the base of sex and race under Title VII of the Civil Rights Act of 1964 and a claim for age discrimination under the Arizona Civil Rights Act ("ACRA"). A Title VII plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory act, and the failure to do so "will usually operate to bar that person from bringing a lawsuit." *Arizona ex rel. Horne v. Geo Group*, Inc., 816 F.3d 1189, 1202 (9th Cir. 2016). The ACRA "requires an employee to file a charge with the Arizona Civil Rights Division within 180 days of an alleged violation." *Peterson v. City of Surprise*, 418 P.3d 1020 (Ariz. Ct. App. 2018). For discrete discriminatory acts, such as termination, each act "starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Prior acts outside the statutory period may be used "as background evidence in support of a timely claim." *Id.* In the context of a hostile work environment claim, conduct occurring outside the statutory time period may be considered "so long as an act contributing to that hostile environment takes place within the statutory time period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104 (2002).

Plaintiff filed his Charge of Discrimination ("Charge") with the EEOC and the Civil Rights Division of the Arizona Attorney General's Office on January 5, 2023, so only discrete acts that occurred within the 300 days before January 5, 2023, are actionable. *See*

*Morgan*, 536 U.S. at 114. Plaintiff checked the boxes for discrimination based on race, sex, and retaliation, but not age. The Charge alleged Marquez had commented in 2021 that Plaintiff had a "tight ass," and Marquez also said Plaintiff had a "big black dick," Marquez refused to give Plaintiff a bonus or raise in March 2022, Plaintiff filed an internal complaint with HR in May 2022, and Defendant terminated Plaintiff in retaliation for this complaint on July 11, 2022. (Doc 44 at 19). In the "DATE DISCRIMINATION TOOK PLACE" field, Plaintiff wrote that the latest act of discrimination took place on June 11, 2022, apparently referring to his termination. *Id.*

Defendant argues Plaintiff's sex and race discrimination claims were untimely because Marquez' alleged comments took place in 2021, more than 300 days before the January 5, 2023 Charge. However, the dates of Marquez' comments then are not dispositive. Plaintiff clearly identified his July 11, 2022 termination as Defendant's discriminatory action. This was only 178 days before the Charge, well within the statutory period. Thus, a January 5, 2023 charge of discrimination based on the termination is timely. Marquez' comments may not be actionable as discrete acts but may be considered "as background evidence in support of [Plaintiff's] timely claim" of discriminatory termination or may be considered timely if constituting part of a claim for a hostile work environment.

### i. Discrimination on the Basis of Age

Defendant argues Plaintiff's claim for age discrimination is also barred because it was not included in Plaintiff's Charge of Discrimination. Like Title VII's administrative exhaustion requirement[4], the ACRA requires an employee to file a charge of discrimination with the Arizona Civil Rights Division. *Peterson v. City of Surprise*, 418 P.3d 1020, 1024 (Ariz. Ct. App. 2018) (stating a Plaintiff who fails to timely file a charge with the ACRA loses the right to sue); s*ee also Lopez v. Produce Exchange*, 171 F. App'x. 11, 12 (9th Cir. 2006) (stating a Title VII Plaintiff must have exhausted his administrative remedies and "title VII and the Arizona Civil Rights Act (ACRA) are generally identical.") However,

---

[4] *See Lopez v. Produce Exchange*, 171 F. App'x. 11, 12 (9th Cir. 2006) (stating a Title VII Plaintiff must have exhausted his administrative remedies and "title VII and the Arizona Civil Rights Act (ACRA) are generally identical.")

the court may consider "any charges of discrimination that are like or reasonably related to the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations." *Leong v. Potter*, 347 F.3d 1117, 1122; *see also Green v. Los Angeles Cnty. Superintendent of Schs.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989) ("Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge.") To determine whether a claim is like or reasonably related to an EEOC charge, courts consider "such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634 (9th Cir. 2003), *as amended* (Jan. 2, 2004).

Here, Plaintiff's EEOC charge notes Marquez' sexual and racial comments and Plaintiff's July 2022 termination. Plaintiff explicitly alleged he was discriminated against "because of [his] race, Black, sex, male, and for opposing a practice made unlawful," and checked the boxes for "RACE," "SEX," and "RETALIATION" under the "CAUSE OF DISCRIMINATION BASED ON" section. While Plaintiff's age discrimination claim arises from the same general events as the claims in the Charge, there is nothing to suggest Defendant was on notice of a possible age discrimination claim based on the allegations in the EEOC charge. Plaintiff now alleges age discrimination based upon the fact that he was 64 years old at the time of his termination and was replaced by a man 11 years younger than him. (Docs. 42 ¶ 37; 53 ¶ 37). Mr. Large was 53 years old at the time of Plaintiff's termination and does not fall outside Plaintiff's protected class for purposes of age, and neither his nor Plaintiff's age is referenced in the Charge. The Court finds Plaintiff's age discrimination claim is not "like or reasonably related to" Plaintiff's EEOC Charge.

Because Plaintiff's age discrimination claim is not administratively exhausted, Defendant's Motion for Summary Judgment will be granted as to this claim.

**b. Retaliation**

"To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240. In the context of retaliation, an "adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Id.* at 1237. If the employer proffers a legitimate, nonretaliatory reason for its action, the plaintiff must then show the articulated reason is pretextual because it is unworthy of credence or because a retaliatory reason more likely than not motivated the action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987).

Plaintiff alleges he was terminated in retaliation for filing a complaint about the behavior of his supervisor, Marquez. Defendant argues it is entitled to Summary Judgment because Plaintiff cannot show a causal link between his complaint and termination, nor can he establish that Defendant's articulated reason for the termination was pretextual.

Defendant asserts Plaintiff was terminated on the basis of his statements about Department leadership during the recorded calls. The termination paperwork stated Plaintiff,

> "has engaged in insubordinate behavior and made unprofessional, profane, racially charged, and derogatory statements to a co-worker while on duty . . . . Mr. Daniels' supervisory chain has been working with him since 2019 to address concerns related to impatience, disrespect, and lack of courtesy that has led to confrontational interactions with customers and coworkers. Executive leadership does not believe further corrective action will be effective in light of Mr. Daniels' failure to respond to the coaching and correction he has previously received, coupled with his articulated disdain and lack of respect for his chain of command that would administer corrective action."

(Doc. 44 at 67). Plaintiff has presented sufficient admissible evidence to raise a triable question of fact whether this explanation is pretextual and a retaliatory reason more likely than not motivated the action.

Defendant's explanation characterizes Plaintiff's comments as insubordinate behavior, unprofessional, profane, racially charged, and derogatory and therefore

providing the basis for his termination. However, there is no admissible evidence that Plaintiff's allegedly derogatory statements were intended to be conveyed to the individuals he was speaking about. (*See* Doc. 51-4 at 29 (Plaintiff tells Large, "Yeah, so don't repeat any of that . . . . but that's what's going on.")) Nor is there a clear and reasonable explanation for why angry workplace griping about leadership to a coworker who purportedly already intends to quit[5] qualifies as insubordinate behavior. Furthermore, while Plaintiff was terminated, the evidence does not appear to show that Derek Large was disciplined in any way for recording a co-employee's statements—indeed, it is at least arguable he may have been rewarded with a promotion for recording a fellow employee without his knowledge or consent or for his purported agreement with each of Plaintiff's statements. (*See* Doc. 51-4 at 26-36). And while it is by no means established as a matter of law that Mr. Large acted at Defendant's behest[6], the coincidental timing of the recordings and Mr. Large's unexplained immediate replacement of Plaintiff raise at least a possible admissible inference that Defendant arranged for Large to record the conversations.[7]

Defendant's explanation also refers to Plaintiff's longstanding issues with "patience, disrespect, and a lack of courtesy that has led to confrontational interactions with customers and coworkers." (Doc. 44 at 53). The evidence on summary judgment shows Defendant knew of Plaintiff's similar behaviors since at least 2019 and allegedly investigated them in 2021. (Docs. 42-2 at 8-10; 44 at 67). The internal investigation revealed allegations that Plaintiff was "unprofessional and brusque," "regularly bad-mouthed other employees, and especially talked poorly about Executive Leadership[,] claiming that they didn't know what they were doing" and even "ma[de] threats to his

---

[5] Plaintiff avers in his declaration that in the recorded phone calls, Large claimed to have given his two-weeks' notice. (Doc. 42-1 at 3).

[6] Plaintiff argues "[Defendant] admits that, after May 2, 2022, it began targeting Daniels for termination through the recordings made by Mr. Large." (Doc. 41 at 11). However, the statement Plaintiff relies on, that "Mr. Large had recorded those phone conversations for the purpose of providing proof to ADVS of Daniels' inappropriate comments and behavior towards coworkers," (Doc. 42-2 at 6) speaks only to Mr. Large's alleged motive and includes no such admission by Defendant.

[7] Defendant has not addressed its policy for surreptitious recordings of employees.

coworkers that he was going to take Marquez down and get him fired." (Doc. 51-4 at 4). Despite these issues, Plaintiff's behaviors had never previously resulted in discipline beyond reflection in his performance reviews, and he generally received merit-based raises. A reasonable jury could infer the reason Defendant acted more harshly on this occasion by resorting to termination was a desire to retaliate against Plaintiff for his complaint.

The timeline also supports a possible inference of retaliatory motive.[8] Here, Plaintiff filed his complaint on May 2, 2022. The first phone call Mr. Large recorded occurred on May 18, approximately two weeks after Plaintiff filed his complaint. On June 15, 2022, Plaintiff was placed on administrative leave pending an investigation. This occurred while the investigation into Marquez' behavior was still underway. Ultimately, both Marquez' resignation and Plaintiff's termination became effective on the exact same day on July 11, 2022. This suggestive timeline taken with the other circumstantial evidence creates a question of fact whether Defendant had a retaliatory motive.

### c. Discrimination

To establish a prima facie case of race or sex discrimination, Plaintiff must show that "(1) [he] belongs to a protected class; (2) [he] was qualified for [his] position; (3) [he] was subject to an adverse employment action; and (4) similarly situated individuals outside [his] protected class were treated more favorably." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). Once a plaintiff makes out a prima facie case, the burden shifts to the defendant, under the *McDonnell Douglas* framework, to provide a legitimate, non-discriminatory reason for the alleged disparate treatment. *Vasquez v. Cnty.*

---

[8] A causal link between protected activity and an adverse employment action "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Intern.*, 630 F.3d 928, 936 (9th Cir. 2011). *See also Mueller v. Car Wash Partners Inc.*, 2021 WL 4247928, at *6 (D. Ariz. Sept. 17, 2021) (Summarizing cases in which temporal proximity supported a causal link between protected action and termination).

*of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). If the employer can do so, the burden shifts back to the Plaintiff to establish that the employer's reasoning is pretext for discrimination. "The ultimate question [is] whether plaintiff has proven that the defendant intentionally discriminated against [him] because of his race," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (date?).

### i. Race Discrimination

Defendant has misconstrued Plaintiff's racial discrimination claim as a hostile work environment claim as explained further below. Although Plaintiff in his complaint mentioned a "hostile work environment", he actually stated a claim for disparate treatment based upon his race, and he provided sufficient admissible evidence to create a genuine issue of material fact whether his termination was a result of racial discrimination.

The first question is whether Plaintiff has made a prima facie showing of racial discrimination. There is no dispute Plaintiff belongs to a protected class, that he was qualified for his position, and that he was subject to an adverse employment action when he was terminated on July 11, 2022. After Plaintiff's termination, he was replaced by Derek Large, a white man. This is sufficient to create a prima facie case for race discrimination. *See Id.* at 777-78 ("[Plaintiff] can satisfy the fourth element of the prima facie case merely by showing that she was replaced by someone outside her protected class.")

Although Defendant has offered a nondiscriminatory explanation for Plaintiff's termination, Plaintiff has proffered sufficient evidence to reach a jury on the issue of pretext by casting doubt on the validity of this explanation.

The termination paperwork cited both Plaintiff's longstanding interpersonal behavior issues and his statements on the recorded phone calls. However, these behaviors had been noted since at least 2019 and had never resulted in discipline beyond notation in performance evaluations. Swearing and yelling may have been generally accepted in the Department,[9] as demonstrated by Ms. Elena Adame's statement that she had been yelled

---

[9] The following allegations taken from the Office of Equal Opportunity's Executive Summary of the investigation into Luis Marquez and used in support of the department's substantiation of the allegations of unprofessional behavior by Marquez are admissible under Federal Rules of Evidence 803(6) and 801(d)(2). *See* Fed. R. Evid. 803(6) (A record

and sworn at by Marquez in the presence of Director Colonel Wanda Wright and CFO Amy Besco, and that Besco laughed and Wright said nothing; Ms. Nicole Sullivan's statement that Wright and Assistant Director John Scott "were both aware of Mr. Marquez' behavior but chose not to get involved,"; Mr. Bryan Durham's "uncomfortable exit interview with the Director" in which he felt she was "condescending and rude"; Ms. Tera Shere's statement that Marquez' was promoted to Assistant Deputy Director despite previous complaints, and that when she spoke to Wright about concerns regarding Marquez' behavior, Wright "told her, in essence, that she was weak" and "told her she was the problem because she was unable to accept other people's behaviors"; Marquez' claim that profanity "is part of the culture"; and Danielle Salomon's statement that she recalled complaints regarding Marquez and his team and that she had personally found that Marquez, Daniels, Besco, and Accounting Manager Elizabeth Rominger "can come across very strong." (Doc. 42-2 at 17-22). In light of this apparent environment, a jury could well disbelieve Defendant's explanation that Plaintiff was fired for unprofessional statements in a phone call with a coworker.

Defendant's descriptions of Plaintiff's comments are also largely in line with the descriptions from the 2021 investigation of Plaintiff's behavior: "unprofessional," "insubordinate," "derogatory," and "disrespectful," for which he had not previously been disciplined. (Doc. 51-4 at 3-4). The inconsistency of Defendant' response to these behaviors—merely noting the issues in a performance evaluation after the investigation, and then immediately terminating Plaintiff after the phone calls—with no evidence of progressive discipline in between raises a possible inference that Plaintiff's statements to Large were not the true reason for his termination, but merely a pretext for discriminatory motives.

Other circumstantial evidence creates a possible inference that Defendant may have

kept in the course of a regularly conducted activity of a business from information transmitted by someone with knowledge, such as an HR investigative report, is an exception to the rule against hearsay); Fed. R. Evid. 801(d)(2) (a statement offered against a party that is "one the party manifested that it adopted or believed to be true" is not hearsay).

engineered Large's actions to create a pretext for terminating Plaintiff. For example, the investigation leading to Plaintiff's termination was minimal; it consisted of a review of the phone call transcripts and a conversation with Plaintiff during which,

> Mr. Daniels stated that he does not remember having a conversation[] which included [certain statements from the transcripts] with another individual while at work. [The interviewer] asked Mr. Daniels if he may have had a conversation similar to the above mentioned statement using unprofessional comments while at work and he responded, "Yeah, possibly."

(Doc. 44 at 53). In contrast, the investigation into Luis Marquez included interviews of eleven people and detailed factual findings.

Mr. Large, the same employee who created the recordings, was rewarded with Plaintiff's position. Plaintiff's evidence indicates this was a substantial promotion: it was three job grades higher than Large's previous role, with a salary increased from $28.00 per hour to $85,000 per year. (Doc. 42-4 at 2, 8). And Plaintiff has provided evidence in the form of his sworn declaration that Mr. Large "frequently made negative comments. . . [about] ADVS leadership." (Doc. 42-1 at 3). The fact that Mr. Large provided the evidence Defendant relied on in terminating Plaintiff raises a reasonable inference that it was given in exchange for the job and Defendant's explanation was a pretext for racial discrimination.

Viewing the admissible evidence in the light most favorable to Plaintiff, these are "circumstances giving rise to an inference of discrimination." *Lui v. DeJoy*, 129 F.4th 770, 778 (9th Cir. 2025). Defendant's Motion for Summary Judgment will be denied on this claim.

### ii. Sex Discrimination

As with Plaintiff's claim for racial discrimination, Defendant's argument that Plaintiff's EEOC Charge was untimely does not provide sufficient basis for granting summary judgment on the claim of sex discrimination. Although Defendant states the Charge was based on two comments that both occurred more than 300 days before the Charge was filed, Plaintiff contends the Charge was based on repeated conduct that

occurred repeatedly over the course of two years, as alleged in his internal complaint, leaving a question of fact regarding the timeliness issue. Additionally, the adverse action Plaintiff complains of is his termination, not merely Marquez' conduct, and the termination occurred July 11, 2022, 178 days before his Charge was filed with the EEOC and the Arizona Civil Rights Division, and within the acceptable time range. Nevertheless, Plaintiff has not carried his substantive burden of proof for discrimination on the basis of sex and the Motion will be granted on this claim.

Defendant characterizes Plaintiff's claim for discrimination on the basis of sex as a hostile work environment claim. Plaintiff contends this is a mischaracterization, but argues the claim meets the requirements for a hostile work environment regardless. (Doc. 54 at 3). Under either theory, Plaintiffs evidence is insufficient to create a genuine issue of material fact.

Here, the only adverse employment action is Plaintiff's termination. Plaintiff alleged "similarly situated individuals outside [his] protected class were treated more favorably" and points to Derek Large, who also made negative comments about ADVS employees and leadership but was given Plaintiff's job after the termination. But Derek Large, a man, is not outside Plaintiff's protected class for the purposes of sex and cannot support an inference that Plaintiff's termination was based on sex. In his Motion for Summary Judgment, Plaintiff advances Colonel Wanda Wright, the department's director, as a similarly situated individual for the first time. Plaintiff argues Colonel Wright "made racial slurs in the workplace" when she, after learning that Senator McCain had visited one of the ADVS homes for only 15 minutes, taken pictures, and left, commented "that was mighty white of him." (Doc. 41 at 9). No action was taken against Wright for this alleged comment. Employees are similarly situated "when they have similar jobs and display similar conduct"; "employees in supervisory positions are generally deemed not to be similarly situated to lower level employees." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Plaintiff has not provided evidence indicating Wright's position as Director of ADVS was similar in any respect to his position, and one racial comment

about the behavior of a non-employee and public figure is not sufficiently similar to Plaintiff's alleged profanity-laced tirade against his supervisors. On the evidence provided, no reasonable jury could conclude Plaintiff was terminated on the basis of sex.

To state a claim for a hostile work environment, Plaintiff must show unwelcome conduct that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Ellison v. Brady,* 924 F.2d 872, 876 (9th Cir. 1991). This standard requires extreme conduct. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code . . . . We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment") (citation modified). "[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Plaintiff has presented evidence that over the course of two years, his supervisor Luis Marquez (1) commented that the reason Plaintiff needed to sit down was because he "had a tight ass," (2) said on at least four occasions that Plaintiff's work with other employees was going well because they "like big black dick," (3) commented to Plaintiff that a song lyric sounded like it said "I want you to suck me," and (4) said that Plaintiff and another coworker had been "getting it on." (Docs. 44 at 26, 29; 42-1 at 2).

Instances where the courts have found sex discrimination on the basis of a hostile work environment have included themes such as physical touching, sexual advances and requests for sexual favors, frequently repeated and long-lasting conduct, and threats.[10]

---

[10] *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998) (employee was subjected to repeated humiliation, physical assault, and threat of rape); *Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir. 2000) (employee was subjected to repeated unwelcome sexual advances, physical assault, and obscene phone calls, and her superiors enabled the

- 16 -

Although Plaintiff states "the conduct was sufficiently severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment," this statement is conclusory and unsupported by the evidence of a handful of "mere offensive [comments]" of a sexual nature. *Harris v. Forklift* Systems, 510 U.S.17, 23; *Panelli v. First American Title Ins. Co.*, 704 F. Supp. 2d 1016 (D. Nev. 2010) (finding no hostile work environment where male supervisors pressured female plaintiffs to go to a brothel, commented on who they would like "to do", commented they "couldn't wait for the men to get a hold of" another female employee, grabber their own nipples and danced like Austin Powers, and commented regarding a marketing executive that "all she has to do was just shake her tits"); *Pieszak v. Glendale Adventist Medical Center*, 112 F. Supp. 2d 970 (C.D. Cal. 2000) (finding there was no hostile work environment where a plaintiff "was subject to a barrage of harassing conduct" but "the substantial majority of that barrage was not connected to sex or gender" and only "about fifteen to twenty different incidents over an eighteen-month period" were connected to gender); *Cleese v. Hewlett-Packard Co.*, 911 F. Supp. 1312 (Dist. Or. 1995) (finding a few offensive comments not of a sexual nature, and one comment on the size of Plaintiff's breasts, and one comment that women were inferior did not constitute a hostile work environment); *Lappin v. Laidlaw Transic Inc.*, 179 F.Supp.2d 1111 (N.D. Cal. 2001) (Defendants' comments on Plaintiff's clothes, references to other co-workers' bodies, statements that Plaintiff had "nice legs," a "tiny butt," and a "tight ass," use of "'the F word' and the word 'bitch' in reference to her on 'probably several occasions,'" and two incidents where Defendant "stuck out his tongue and wiggled it around at her" and another "stared at her while raising his eyebrows and puckering his lips" did not "appear to establish conduct" amounting to a hostile work

behavior and retaliated against employee for complaining); *Priest v. Rotary*, 809 F. Supp 771 (N.D. Cal. 1986) (defendant subjected plaintiff and other employees to repeated unwelcome physical and verbal sexual conduct, including restraining, kissing, rubbing, exposing his genitals, or unzipping plaintiff's uniform); *Miller v. D.F. Zee's, Inc.*, 31 F. Supp. 2d 792 (D. Or. 1998) (defendant "created a sexualized atmosphere in the workplace which included joking, touching, requests for dates, requests for sex, and other sexual comments and remarks" over the course of years despite many complaints).

environment). Only a few of Marquez' alleged comments toward Plaintiff were of a sexual nature, and over the course of two years of alleged harassment, Plaintiff has alleged fewer than the fifteen to twenty incidents found insufficient in *Pieszak*. Plaintiff has not given evidence of any physical touching or requests for sex. Particularly in light of Defendant's investigation of Marquez and Marquez' subsequent forced resignation when Plaintiff complained, the specific conduct Plaintiff complains of does not rise to the level necessary to establish a hostile work environment.

Because Plaintiff's evidence fails to establish the existence of genuine issues of material fact as to his claim for discrimination on the basis of sex, Defendant's Motion for Summary Judgment will be granted on this claim.

### d. Plaintiff's Motion for Partial Summary Judgment

Plaintiff has failed to establish the absence of genuine questions of material fact. Plaintiff has proffered no direct admissible evidence of discrimination.[11] Although Plaintiff has proffered sufficient admissible circumstantial evidence to reach a jury on his racial discrimination and retaliation claims as described above, when considering his motion for summary judgment, Defendant's "evidence. . . is to be believed, and all justifiable inferences are to be drawn in [Defendant's] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Plaintiff's termination paperwork states that his comments in the recorded calls led management to conclude further attempts to remediate his alleged longstanding behavioral issues would not be successful, thereby stating a non-discriminatory reason for the termination. A reasonable jury could credit this explanation. Plaintiff states "the State admits that it actively sought out a basis for terminating Daniels," (Doc. 41 at 10), but the State (Defendant) has made no such admission and, indeed, offers evidence that Mr. Large acted alone and of his own volition. (Doc. 53 ¶ 18). Based upon the admissible evidence, a reasonable jury could find for Defendant. Plaintiff's Motion (Doc. 41) will be denied.

Accordingly,

---

[11] *See supra*, note 4

**IT IS ORDERED** Plaintiff's Motion for Partial Summary Judgment, (Doc. 41), is **DENIED.**

**IT IS FURTHER ORDERED** Defendant's Motion for Summary Judgment, (Doc. 43), is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Counts One and Four of the Third Amended Complaint (Doc. 28), Discrimination on the Basis of Sex and Discrimination on the Basis of Age, and **DENIED** as to Counts Two and Three, Discrimination on the Basis of Race and Retaliation.

Dated this 14th day of April, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge